Justice THOMAS, dissenting.
Today the Court strikes down two state statutory provisions in all of their applications, at the behest of abortion clinics and doctors. That decision exemplifies the Court's troubling tendency "to bend the rules when any effort to limit abortion, or even to speak in opposition to abortion, is at issue." Stenberg v. Carhart, 530 U.S. 914, 954, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Scalia, J., dissenting). As Justice ALITO observes, see post (dissenting opinion), today's decision creates an abortion exception to ordinary rules of res judicata, ignores compelling evidence that Texas' law imposes no unconstitutional burden, and disregards basic principles of the severability doctrine. I write separately to emphasize how today's decision perpetuates the Court's habit of applying different rules to different constitutional rights-especially the putative right to abortion.
To begin, the very existence of this suit is a jurisprudential oddity. Ordinarily, plaintiffs cannot file suits to vindicate the constitutional rights of others. But the Court employs a different approach to rights that it favors. So in this case and many others, the Court has erroneously allowed doctors and clinics to vicariously vindicate the putative constitutional right of women seeking abortions.
This case also underscores the Court's increasingly common practice of invoking a given level of scrutiny-here, the abortion-specific undue burden standard-while applying a different standard of review entirely. Whatever scrutiny the majority applies to Texas' law, it bears little resemblance to the undue-burden test the Court articulated in Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and its successors. Instead, the majority eviscerates important features of that test to return to a regime like the one that Casey repudiated.
Ultimately, this case shows why the Court never should have bent the rules for favored rights in the first place. Our law is now so riddled with special exceptions for special rights that our decisions deliver neither predictability nor the promise of a judiciary bound by the rule of law.
I
This suit is possible only because the Court has allowed abortion clinics and physicians to invoke a putative constitutional right that does not belong to them-a *2322 woman's right to abortion. The Court's third-party standing jurisprudence is no model of clarity. See Kowalski v. Tesmer, 543 U.S. 125, 135, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (THOMAS, J., concurring). Driving this doctrinal confusion, the Court has shown a particular willingness to undercut restrictions on third-party standing when the right to abortion is at stake. And this case reveals a deeper flaw in straying from our normal rules: when the wrong party litigates a case, we end up resolving disputes that make for bad law.
For most of our Nation's history, plaintiffs could not challenge a statute by asserting someone else's constitutional rights. See ibid. This Court would "not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect and who has therefore no interest in defeating it." Clark v. Kansas City, 176 U.S. 114, 118, 20 S.Ct. 284, 44 L.Ed. 392 (1900) (internal quotation marks omitted). And for good reason: "[C]ourts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." Broadrick v. Oklahoma, 413 U.S. 601, 610-611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
In the 20th century, the Court began relaxing that rule. But even as the Court started to recognize exceptions for certain types of challenges, it stressed the strict limits of those exceptions. A plaintiff could assert a third party's rights, the Court said, but only if the plaintiff had a "close relation to the third party" and the third party faced a formidable "hindrance" to asserting his own rights. Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ; accord, Kowalski, supra, at 130-133, 125 S.Ct. 564 (similar).
Those limits broke down, however, because the Court has been "quite forgiving" in applying these standards to certain claims. Id., at 130, 125 S.Ct. 564. Some constitutional rights remained "personal rights which ... may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (Fourth Amendment rights are purely personal); see Rakas v. Illinois, 439 U.S. 128, 140, n. 8, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (so is the Fifth Amendment right against self-incrimination). But the Court has abandoned such limitations on other rights, producing serious anomalies across similar factual scenarios. Lawyers cannot vicariously assert potential clients' Sixth Amendment rights because they lack any current, close relationship. Kowalski, supra, at 130-131, 125 S.Ct. 564. Yet litigants can assert potential jurors' rights against race or sex discrimination in jury selection even when the litigants have never met potential jurors and do not share their race or sex. Powers, supra, at 410-416, 111 S.Ct. 1364 ; J.E.B. v. Alabama ex rel. T. B., 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). And vendors can sue to invalidate state regulations implicating potential customers' equal protection rights against sex discrimination. Craig v. Boren, 429 U.S. 190, 194-197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (striking down sex-based age restrictions on purchasing beer).
Above all, the Court has been especially forgiving of third-party standing criteria for one particular category of cases: those involving the purported substantive due process right of a woman to abort her unborn child. In Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), a plurality of this Court fashioned a blanket rule allowing third-party standing in abortion cases. Id., at 118, 96 S.Ct. 2868. "[I]t generally is appropriate," said the Court, "to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." Ibid . Yet the plurality conceded *2323 that the traditional criteria for an exception to the third-party standing rule were not met. There are no "insurmountable" obstacles stopping women seeking abortions from asserting their own rights, the plurality admitted. Nor are there jurisdictional barriers. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), held that women seeking abortions fell into the mootness exception for cases " 'capable of repetition, yet seeking review,' " enabling them to sue after they terminated their pregnancies without showing that they intended to become pregnant and seek an abortion again. Id ., at 125, 93 S.Ct. 705. Yet, since Singleton, the Court has unquestioningly accepted doctors' and clinics' vicarious assertion of the constitutional rights of hypothetical patients, even as women seeking abortions have successfully and repeatedly asserted their own rights before this Court.[1]
Here too, the Court does not question whether doctors and clinics should be allowed to sue on behalf of Texas women seeking abortions as a matter of course. They should not. The central question under the Court's abortion precedents is whether there is an undue burden on a woman's access to abortion. See Casey, 505 U.S., at 877, 112 S.Ct. 2791 (plurality opinion); see Part II, infra . But the Court's permissive approach to third-party standing encourages litigation that deprives us of the information needed to resolve that issue. Our precedents encourage abortion providers to sue-and our cases then relieve them of any obligation to prove what burdens women actually face. I find it astonishing that the majority can discover an "undue burden" on women's access to abortion for "those [women] for whom [Texas' law] is an actual rather than an irrelevant restriction," ante, at 2320 (internal quotation marks omitted), without identifying how many women fit this description; their proximity to open clinics; or their preferences as to where they obtain abortions, and from whom. "[C]ommonsense inference[s]" that such a burden exists, ante, at 2318, are no substitute for actual evidence. There should be no surer sign that our jurisprudence has gone off the rails than this: After creating a constitutional right to abortion because it "involve[s] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," Casey, supra, at 851, 112 S.Ct. 2791 (majority opinion), the Court has created special rules that cede its enforcement to others.
II
Today's opinion also reimagines the undue-burden standard used to assess the constitutionality of abortion restrictions. Nearly 25 years ago, in *2324 Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674, a plurality of this Court invented the "undue burden" standard as a special test for gauging the permissibility of abortion restrictions. Casey held that a law is unconstitutional if it imposes an "undue burden" on a woman's ability to choose to have an abortion, meaning that it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id., at 877, 112 S.Ct. 2791. Casey thus instructed courts to look to whether a law substantially impedes women's access to abortion, and whether it is reasonably related to legitimate state interests. As the Court explained, "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power" to regulate aspects of abortion procedures, "all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." Gonzales v. Carhart, 550 U.S. 124, 158, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007).
I remain fundamentally opposed to the Court's abortion jurisprudence. E.g., id., at 168-169, 127 S.Ct. 1610 (THOMAS, J., concurring); Stenberg, 530 U.S., at 980, 982, 120 S.Ct. 2597 (THOMAS, J., dissenting). Even taking Casey as the baseline, however, the majority radically rewrites the undue-burden test in three ways. First, today's decision requires courts to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." Ante, at 2309. Second, today's opinion tells the courts that, when the law's justifications are medically uncertain, they need not defer to the legislature, and must instead assess medical justifications for abortion restrictions by scrutinizing the record themselves. Ibid. Finally, even if a law imposes no "substantial obstacle" to women's access to abortions, the law now must have more than a "reasonabl[e] relat[ion] to ... a legitimate state interest." Ibid. (internal quotation marks omitted). These precepts are nowhere to be found in Casey or its successors, and transform the undue-burden test to something much more akin to strict scrutiny.
First, the majority's free-form balancing test is contrary to Casey . When assessing Pennsylvania's recordkeeping requirements for abortion providers, for instance, Casey did not weigh its benefits and burdens. Rather, Casey held that the law had a legitimate purpose because data collection advances medical research, "so it cannot be said that the requirements serve no purpose other than to make abortions more difficult." 505 U.S., at 901, 112 S.Ct. 2791 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.). The opinion then asked whether the recordkeeping requirements imposed a "substantial obstacle," and found none.Ibid . Contrary to the majority's statements, see ante, at 2309, Casey did not balance the benefits and burdens of Pennsylvania's spousal and parental notification provisions, either. Pennsylvania's spousal notification requirement, the plurality said, imposed an undue burden because findings established that the requirement would "likely ... prevent a significant number of women from obtaining an abortion"-not because these burdens outweighed its benefits. 505 U.S., at 893, 112 S.Ct. 2791 (majority opinion); see id., at 887-894, 112 S.Ct. 2791. And Casey summarily upheld parental notification provisions because even pre-Casey decisions had done so. Id., at 899-900, 112 S.Ct. 2791 (joint opinion).
Decisions in Casey' s wake further refute the majority's benefits-and-burdens balancing test. The Court in Mazurek v. Armstrong, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam ), had no difficulty upholding a Montana law authorizing *2325 only physicians to perform abortions-even though no legislative findings supported the law, and the challengers claimed that "all health evidence contradict[ed] the claim that there is any health basis for the law." Id., at 973, 117 S.Ct. 1865 (internal quotation marks omitted). Mazurek also deemed objections to the law's lack of benefits "squarely foreclosed by Casey itself." Ibid. Instead, the Court explained, " 'the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others .' " Ibid. (quoting Casey, supra, at 885, 112 S.Ct. 2791 ; emphasis in original); see Gonzales, supra, at 164, 127 S.Ct. 1610 (relying on Mazurek ).
Second, by rejecting the notion that "legislatures, and not courts, must resolve questions of medical uncertainty," ante, at 2310, the majority discards another core element of the Casey framework. Before today, this Court had "given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." Gonzales, 550 U.S., at 163, 127 S.Ct. 1610. This Court emphasized that this "traditional rule" of deference "is consistent with Casey ." Ibid. This Court underscored that legislatures should not be hamstrung "if some part of the medical community were disinclined to follow the proscription." Id., at 166, 127 S.Ct. 1610. And this Court concluded that "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." Ibid .; see Stenberg, supra, at 971, 120 S.Ct. 2597 (KENNEDY, J., dissenting) ("the right of the legislature to resolve matters on which physicians disagreed" is "establish[ed] beyond doubt"). This Court could not have been clearer: Whenever medical justifications for an abortion restriction are debatable, that "provides a sufficient basis to conclude in [a] facial attack that the [law] does not impose an undue burden." Gonzales, 550 U.S., at 164, 127 S.Ct. 1610. Otherwise, legislatures would face "too exacting" a standard. Id., at 166, 127 S.Ct. 1610.
Today, however, the majority refuses to leave disputed medical science to the legislature because past cases "placed considerable weight upon the evidence and argument presented in judicial proceedings." Ante, at 2310. But while Casey relied on record evidence to uphold Pennsylvania's spousal-notification requirement, that requirement had nothing to do with debated medical science. 505 U.S., at 888-894, 112 S.Ct. 2791 (majority opinion). And while Gonzales observed that courts need not blindly accept all legislative findings, see ante, at 2309 - 2310, that does not help the majority. Gonzales refused to accept Congress' finding of "a medical consensus that the prohibited procedure is never medically necessary" because the procedure's necessity was debated within the medical community. 550 U.S., at 165-166, 127 S.Ct. 1610. Having identified medical uncertainty, Gonzales explained how courts should resolve conflicting positions: by respecting the legislature's judgment. See id., at 164, 127 S.Ct. 1610.
Finally, the majority overrules another central aspect of Casey by requiring laws to have more than a rational basis even if they do not substantially impede access to abortion. Ante, at 2309 - 2310. "Where [the State] has a rational basis to act and it does not impose an undue burden," this Court previously held, "the State may use its regulatory power" to impose regulations "in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn."
*2326 Gonzales, supra, at 158, 127 S.Ct. 1610 (emphasis added); see Casey, supra, at 878, 112 S.Ct. 2791 (plurality opinion) (similar). No longer. Though the majority declines to say how substantial a State's interest must be, ante, at 2309 - 2310, one thing is clear: The State's burden has been ratcheted to a level that has not applied for a quarter century.
Today's opinion does resemble Casey in one respect: After disregarding significant aspects of the Court's prior jurisprudence, the majority applies the undue-burden standard in a way that will surely mystify lower courts for years to come. As in Casey, today's opinion "simply ... highlight[s] certain facts in the record that apparently strike the ... Justices as particularly significant in establishing (or refuting) the existence of an undue burden." 505 U.S., at 991, 112 S.Ct. 2791 (Scalia, J., concurring in judgment in part and dissenting in part); see ante, at 2311 - 2312, 2315 - 2317. As in Casey, "the opinion then simply announces that the provision either does or does not impose a 'substantial obstacle' or an 'undue burden.' " 505 U.S., at 991, 112 S.Ct. 2791 (opinion of Scalia, J); see ante, at 2313, 2318. And still "[w]e do not know whether the same conclusions could have been reached on a different record, or in what respects the record would have had to differ before an opposite conclusion would have been appropriate." 505 U.S., at 991, 112 S.Ct. 2791 (opinion of Scalia, J.); cf. ante, at 2313, 2315 - 2316. All we know is that an undue burden now has little to do with whether the law, in a "real sense, deprive[s] women of the ultimate decision," Casey, supra, at 875, 112 S.Ct. 2791 and more to do with the loss of "individualized attention, serious conversation, and emotional support," ante, at 2318.
The majority's undue-burden test looks far less like our post-Casey precedents and far more like the strict-scrutiny standard that Casey rejected, under which only the most compelling rationales justified restrictions on abortion. See Casey, supra, at 871, 874-875, 112 S.Ct. 2791 (plurality opinion). One searches the majority opinion in vain for any acknowledgment of the "premise central" to Casey 's rejection of strict scrutiny: "that the government has a legitimate and substantial interest in preserving and promoting fetal life" from conception, not just in regulating medical procedures. Gonzales, supra, at 145, 127 S.Ct. 1610 (internal quotation marks omitted); see Casey, supra, at 846, 112 S.Ct. 2791 (majority opinion), 871, 112 S.Ct. 2791 (plurality opinion). Meanwhile, the majority's undue-burden balancing approach risks ruling out even minor, previously valid infringements on access to abortion. Moreover, by second-guessing medical evidence and making its own assessments of "quality of care" issues, ante, at 2311 - 2312, 2315 - 2316, 2318, the majority reappoints this Court as "the country's ex officio medical board with powers to disapprove medical and operative practices and standards throughout the United States." Gonzales, supra, at 164, 127 S.Ct. 1610 (internal quotation marks omitted). And the majority seriously burdens States, which must guess at how much more compelling their interests must be to pass muster and what "commonsense inferences" of an undue burden this Court will identify next.
III
The majority's furtive reconfiguration of the standard of scrutiny applicable to abortion restrictions also points to a deeper problem. The undue-burden standard is just one variant of the Court's tiers-of-scrutiny approach to constitutional adjudication. And the label the Court affixes to its level of scrutiny in assessing whether the government can restrict a given *2327 right-be it "rational basis," intermediate, strict, or something else-is increasingly a meaningless formalism. As the Court applies whatever standard it likes to any given case, nothing but empty words separates our constitutional decisions from judicial fiat.
Though the tiers of scrutiny have become a ubiquitous feature of constitutional law, they are of recent vintage. Only in the 1960's did the Court begin in earnest to speak of "strict scrutiny" versus reviewing legislation for mere rationality, and to develop the contours of these tests. See Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1274, 1284-1285 (2007). In short order, the Court adopted strict scrutiny as the standard for reviewing everything from race-based classifications under the Equal Protection Clause to restrictions on constitutionally protected speech. Id., at 1275-1283. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, then applied strict scrutiny to a purportedly "fundamental" substantive due process right for the first time. Id., at 162-164, 93 S.Ct. 705 ; see Fallon, supra, at 1283 ; accord, Casey, supra, at 871, 112 S.Ct. 2791 (plurality opinion) (noting that post-Roe cases interpreted Roe to demand "strict scrutiny"). Then the tiers of scrutiny proliferated into ever more gradations. See, e.g., Craig, 429 U.S., at 197-198, 97 S.Ct. 451 (intermediate scrutiny for sex-based classifications); Lawrence v. Texas, 539 U.S. 558, 580, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (O'Connor, J., concurring in judgment) ("a more searching form of rational basis review" applies to laws reflecting "a desire to harm a politically unpopular group"); Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam ) (applying " 'closest scrutiny' " to campaign-finance contribution limits). Casey 's undue-burden test added yet another right-specific test on the spectrum between rational-basis and strict-scrutiny review.
The illegitimacy of using "made-up tests" to "displace longstanding national traditions as the primary determinant of what the Constitution means" has long been apparent. United States v. Virginia, 518 U.S. 515, 570, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (Scalia, J., dissenting). The Constitution does not prescribe tiers of scrutiny. The three basic tiers-"rational basis," intermediate, and strict scrutiny-"are no more scientific than their names suggest, and a further element of randomness is added by the fact that it is largely up to us which test will be applied in each case." Id., at 567, 116 S.Ct. 2264 ; see also Craig, supra, at 217-221, 97 S.Ct. 451 (Rehnquist, J., dissenting).
But the problem now goes beyond that. If our recent cases illustrate anything, it is how easily the Court tinkers with levels of scrutiny to achieve its desired result. This Term, it is easier for a State to survive strict scrutiny despite discriminating on the basis of race in college admissions than it is for the same State to regulate how abortion doctors and clinics operate under the putatively less stringent undue-burden test. All the State apparently needs to show to survive strict scrutiny is a list of aspirational educational goals (such as the "cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry") and a "reasoned, principled explanation" for why it is pursuing them-then this Court defers. Fisher v. University of Tex. at Austin, --- U.S. ----, ----, 136 S.Ct. 2198, ----, ---L.Ed.2d ----, 2016 WL 3434399 (2016)ante, at 7, 12 (internal quotation marks omitted). Yet the same State gets no deference under the undue-burden test, despite producing evidence that abortion safety, one rationale for Texas' law, is medically debated. See *2328 Whole Woman's Health v. Lakey, 46 F.Supp.3d 673, 684 (W.D.Tex.2014) (noting conflict in expert testimony about abortion safety). Likewise, it is now easier for the government to restrict judicial candidates' campaign speech than for the Government to define marriage-even though the former is subject to strict scrutiny and the latter was supposedly subject to some form of rational-basis review. Compare Williams-Yulee v. Florida Bar, 575 U.S. ----, ---- - ----, 135 S.Ct. 1656, 1665-1666, 191 L.Ed.2d 570 (2015), with United States v. Windsor, 570 U.S. ----, ----, 133 S.Ct. 2675, 2692-2693, 186 L.Ed.2d 808 (2013).
These more recent decisions reflect the Court's tendency to relax purportedly higher standards of review for less-preferred rights. E.g., Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 421, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (THOMAS, J., dissenting) ("The Court makes no effort to justify its deviation from the tests we traditionally employ in free speech cases" to review caps on political contributions). Meanwhile, the Court selectively applies rational-basis review-under which the question is supposed to be whether "any state of facts reasonably may be conceived to justify" the law, McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) -with formidable toughness. E.g., Lawrence, 539 U.S., at 580, 123 S.Ct. 2472 (O'Connor, J., concurring in judgment) (at least in equal protection cases, the Court is "most likely" to find no rational basis for a law if "the challenged legislation inhibits personal relationships"); see id., at 586, 123 S.Ct. 2472 (Scalia, J., dissenting) (faulting the Court for applying "an unheard-of form of rational-basis review").
These labels now mean little. Whatever the Court claims to be doing, in practice it is treating its "doctrine referring to tiers of scrutiny as guidelines informing our approach to the case at hand, not tests to be mechanically applied." Williams-Yulee, supra, at ----, 135 S.Ct., at 1673 (BREYER, J., concurring). The Court should abandon the pretense that anything other than policy preferences underlies its balancing of constitutional rights and interests in any given case.
IV
It is tempting to identify the Court's invention of a constitutional right to abortion in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, as the tipping point that transformed third-party standing doctrine and the tiers of scrutiny into an unworkable morass of special exceptions and arbitrary applications. But those roots run deeper, to the very notion that some constitutional rights demand preferential treatment. During the Lochner era, the Court considered the right to contract and other economic liberties to be fundamental requirements of due process of law. See Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). The Court in 1937 repudiated Lochner 's foundations. See West Coast Hotel Co. v. Parrish, 300 U.S. 379, 386-387, 400, 57 S.Ct. 578, 81 L.Ed. 703 (1937). But the Court then created a new taxonomy of preferred rights.
In 1938, seven Justices heard a constitutional challenge to a federal ban on shipping adulterated milk in interstate commerce. Without economic substantive due process, the ban clearly invaded no constitutional right. See United States v. Carolene Products Co., 304 U.S. 144, 152-153, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Within Justice Stone's opinion for the Court, however, was a footnote that just three other Justices joined-the famous Carolene Products Footnote 4. See ibid., n. 4; Lusky, Footnote Redux: A Carolene Products Reminiscence, 82 Colum. L. Rev. 1093, 1097 (1982). The footnote's first *2329 paragraph suggested that the presumption of constitutionality that ordinarily attaches to legislation might be "narrower ... when legislation appears on its face to be within a specific prohibition of the Constitution." 304 U.S., at 152-153, n. 4, 58 S.Ct. 778. Its second paragraph appeared to question "whether legislation which restricts those political processes, which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the [14th] Amendment than are most other types of legislation." Ibid. And its third and most familiar paragraph raised the question "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." Ibid.
Though the footnote was pure dicta, the Court seized upon it to justify its special treatment of certain personal liberties like the First Amendment and the right against discrimination on the basis of race-but also rights not enumerated in the Constitution.[2] As the Court identified which rights deserved special protection, it developed the tiers of scrutiny as part of its equal protection (and, later, due process) jurisprudence as a way to demand extra justifications for encroachments on these rights. See Fallon, 54 UCLA L. Rev., at 1270-1273, 1281-1285. And, having created a new category of fundamental rights, the Court loosened the reins to recognize even putative rights like abortion, see Roe, 410 U.S., at 162-164, 93 S.Ct. 705 which hardly implicate "discrete and insular minorities."
The Court also seized upon the rationale of the Carolene Products footnote to justify exceptions to third-party standing doctrine. The Court suggested that it was tilting the analysis to favor rights involving actual or perceived minorities-then seemingly counted the right to contraception as such a right. According to the Court, what matters is the "relationship between one who acted to protect the rights of a minority and the minority itself"-which, the Court suggested, includes the relationship "between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so." Eisenstadt v. Baird, 405 U.S. 438, 445, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (citing Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599, 631 (1962) ).
Eighty years on, the Court has come full circle. The Court has simultaneously transformed judicially created rights like the right to abortion into preferred constitutional rights, while disfavoring many of the rights actually enumerated in the Constitution. But our Constitution renounces the notion that some constitutional rights are more equal than others. A plaintiff either possesses the constitutional right he is asserting, or not-and if not, the judiciary has no business creating ad hoc exceptions so that others can assert rights that seem especially important to vindicate. A law either infringes a constitutional right, or not; there is no room for the judiciary *2330 to invent tolerable degrees of encroachment. Unless the Court abides by one set of rules to adjudicate constitutional rights, it will continue reducing constitutional law to policy-driven value judgments until the last shreds of its legitimacy disappear.
* * *
Today's decision will prompt some to claim victory, just as it will stiffen opponents' will to object. But the entire Nation has lost something essential. The majority's embrace of a jurisprudence of rights-specific exceptions and balancing tests is "a regrettable concession of defeat-an acknowledgement that we have passed the point where 'law,' properly speaking, has any further application." Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1182 (1989). I respectfully dissent.
Justice ALITO, with whom THE CHIEF JUSTICE and Justice THOMAS join, dissenting.
The constitutionality of laws regulating abortion is one of the most controversial issues in American law, but this case does not require us to delve into that contentious dispute. Instead, the dispositive issue here concerns a workaday question that can arise in any case no matter the subject, namely, whether the present case is barred by res judicata. As a court of law, we have an obligation to apply such rules in a neutral fashion in all cases, regardless of the subject of the suit. If anything, when a case involves a controversial issue, we should be especially careful to be scrupulously neutral in applying such rules.
The Court has not done so here. On the contrary, determined to strike down two provisions of a new Texas abortion statute in all of their applications, the Court simply disregards basic rules that apply in all other cases.
Here is the worst example. Shortly after Texas enacted House Bill 2 (H.B. 2) in 2013, the petitioners in this case brought suit, claiming, among other things, that a provision of the new law requiring a physician performing an abortion to have admitting privileges at a nearby hospital is "facially" unconstitutional and thus totally unenforceable. Petitioners had a fair opportunity to make their case, but they lost on the merits in the United States Court of Appeals for the Fifth Circuit, and they chose not to petition this Court for review. The judgment against them became final. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 951 F.Supp.2d 891 (W.D.Tex.2013), aff'd in part and rev'd in part, 748 F.3d 583 (C.A.5 2014) (Abbott ).
Under the rules that apply in regular cases, petitioners could not relitigate the exact same claim in a second suit. As we have said, "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).
In this abortion case, however, that rule is disregarded. The Court awards a victory to petitioners on the very claim that they unsuccessfully pressed in the earlier case. The Court does this even though petitioners, undoubtedly realizing that a rematch would not be allowed, did not presume to include such a claim in their complaint. The Court favors petitioners with a victory that they did not have the audacity to seek.
Here is one more example: the Court's treatment of H.B. 2's "severability clause." When part of a statute is held to be unconstitutional, the question arises whether other parts of the statute must also go. If *2331 a statute says that provisions found to be unconstitutional can be severed from the rest of the statute, the valid provisions are allowed to stand. H.B. 2 contains what must surely be the most emphatic severability clause ever written. This clause says that every single word of the statute and every possible application of its provisions is severable. But despite this language, the Court holds that no part of the challenged provisions and no application of any part of them can be saved. Provisions that are indisputably constitutional-for example, provisions that require facilities performing abortions to follow basic fire safety measures-are stricken from the books. There is no possible justification for this collateral damage.
The Court's patent refusal to apply well-established law in a neutral way is indefensible and will undermine public confidence in the Court as a fair and neutral arbiter.
I
Res judicata-or, to use the more modern terminology, "claim preclusion"-is a bedrock principle of our legal system. As we said many years ago, "[p]ublic policy dictates that there be an end of litigation[,] that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." Baldwin v. Iowa State Traveling Men's Assn., 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931). This doctrine "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.... To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). These are "vital public interests" that should be " 'cordially regarded and enforced.' " Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).
The basic rule of preclusion is well known and has been frequently stated in our opinions. Litigation of a "cause of action" or "claim" is barred if (1) the same (or a closely related) party (2) brought a prior suit asserting the same cause of action or claim, (3) the prior case was adjudicated by a court of competent jurisdiction and (4) was decided on the merits, (5) a final judgment was entered, and (6) there is no ground, such as fraud, to invalidate the prior judgment. See Montana, supra, at 153, 99 S.Ct. 970 ; Commissioner v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948) ; Cromwell v. County of Sac, 94 U.S. 351, 352-353, 24 L.Ed. 195 (1877).
A
I turn first to the application of this rule to petitioners' claim that H.B. 2's admitting privileges requirement is facially unconstitutional.
Here, all the elements set out above are easily satisfied based on Abbott, the 2013 case to which I previously referred. That case (1) was brought by a group of plaintiffs that included petitioners in the present case, (2) asserted the same cause of action or claim, namely, a facial challenge to the constitutionality of H.B. 2's admitting privileges requirement, (3) was adjudicated by courts of competent jurisdiction, (4) was decided on the merits, (5) resulted in the entry of a final judgment against petitioners, and (6) was not otherwise subject to invalidation. All of this is clear, and that is undoubtedly why petitioners'
*2332 attorneys did not even include a facial attack on the admitting privileges requirement in their complaint in this case. To have done so would have risked sanctions for misconduct. See Robinson v. National Cash Register Co ., 808 F.2d 1119, 1131 (C.A.5 1987) (a party's "persistence in litigating [a claim] when res judicata clearly barred the suit violated rule 11"); McLaughlin v. Bradlee, 602 F.Supp. 1412, 1417 (D.D.C.1985) ("It is especially appropriate to impose sanctions in situations where the doctrines of res judicata and collateral estoppel plainly preclude relitigation of the suit").
Of the elements set out above, the Court disputes only one. The Court concludes that petitioners' prior facial attack on the admitting privileges requirement and their current facial attack on that same requirement are somehow not the same cause of action or claim. But that conclusion is unsupported by authority and plainly wrong.
B
Although the scope of a cause of action or claim for purposes of res judicata is hardly a new question, courts and scholars have struggled to settle upon a definition.[1] But the outcome of the present case does not depend upon the selection of the proper definition from among those adopted or recommended over the years because the majority's holding is not supported by any of them.
In Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927), we defined a cause of action as an "actionable wrong." Id., at 321, 47 S.Ct. 600 ; see also ibid . ("A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show"). On this understanding, the two claims at issue here are indisputably the same.
The same result is dictated by the rule recommended by the American Law Institute (ALI) in the first Restatement of Judgments, issued in 1942. Section 61 of the first Restatement explains when a claim asserted by a plaintiff in a second suit is the same for preclusion purposes as a claim that the plaintiff unsuccessfully litigated in a prior case. Under that provision, "the plaintiff is precluded from subsequently maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action." Restatement of Judgments § 61. There is no doubt that this rule is satisfied here.
The second Restatement of Judgments, issued by the ALI in 1982, adopted a new approach for determining the scope of a cause of action or claim. In Nevada v. United States, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983), we noted that the two Restatements differ in this regard, but we had no need to determine which was correct. Id., at 130-131, and n. 12, 103 S.Ct. 2906. Here, the majority simply assumes that we should follow the second Restatement even though that Restatement-on the Court's reading, at least-leads to a conclusion that differs from the conclusion clearly dictated by the first Restatement.
If the second Restatement actually supported the majority's holding, the Court would surely be obligated to explain why it chose to follow the second Restatement's approach. But here, as in Nevada, supra, at 130-131, 103 S.Ct. 2906 application of the rule set out in the second Restatement does not change the result. While the Court relies almost entirely on a comment *2333 to one section of the second Restatement, the Court ignores the fact that a straightforward application of the provisions of that Restatement leads to the conclusion that petitioners' two facial challenges to the admitting privileges requirement constitute a single claim.
Section 19 of the second Restatement sets out the general claim-preclusion rule that applies in a case like the one before us: "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim." Section 24(1) then explains the scope of the "claim" that is extinguished: It "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Section 24's Comment b, in turn, fleshes out the key term "transaction," which it defines as "a natural grouping or common nucleus of operative facts." Whether a collection of events constitutes a single transaction is said to depend on "their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." Ibid.
Both the claim asserted in petitioners' first suit and the claim now revived by the Court involve the same "nucleus of operative facts." Indeed, they involve the very same "operative facts," namely, the enactment of the admitting privileges requirement, which, according to the theory underlying petitioners' facial claims, would inevitably have the effect of causing abortion clinics to close. This is what petitioners needed to show-and what they attempted to show in their first facial attack: not that the admitting privileges requirement had already imposed a substantial burden on the right of Texas women to obtain abortions, but only that it would have that effect once clinics were able to assess whether they could practicably comply.
The Court's decision in Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), makes that clear. Casey held that Pennsylvania's spousal notification requirement was facially unconstitutional even though that provision had been enjoined prior to enforcement. See id., at 845, 112 S.Ct. 2791. And the Court struck down the provision because it "will impose a substantial obstacle." Id ., at 893-894, 112 S.Ct. 2791 (emphasis added). See also id., at 893, 112 S.Ct. 2791 ("The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion" (emphasis added)); id ., at 894, 112 S.Ct. 2791 (Women "are likely to be deterred from procuring an abortion" (emphasis added)).
Consistent with this understanding, what petitioners tried to show in their first case was that the admitting privileges requirement would cause clinics to close. They claimed that their evidence showed that "at least one-third of the State's licensed providers would stop providing abortions once the privileges requirement took effect."[2] Agreeing with petitioners, the District Court enjoined enforcement of the requirement on the ground that "there will be abortion clinics *2334 that will close ." Abbott, 951 F.Supp.2d, at 900 (emphasis added). The Fifth Circuit found that petitioners' evidence of likely effect was insufficient, stating that petitioners failed to prove that "any woman will lack reasonable access to a clinic within Texas." Abbott, 748 F.3d, at 598 (some emphasis added; some emphasis deleted). The correctness of that holding is irrelevant for present purposes. What matters is that the "operative fact" in the prior case was the enactment of the admitting privileges requirement, and that is precisely the same operative fact underlying petitioners' facial attack in the case now before us.[3]
C
In light of this body of authority, how can the Court maintain that the first and second facial claims are really two different claims? The Court's first argument is that petitioners did not bring two facial claims because their complaint in the present case sought only as-applied relief and it was the District Court, not petitioners, who injected the issue of facial relief into the case. Ante, at 2304 - 2305. (After the District Court gave them statewide relief, petitioners happily accepted the gift and now present their challenge as a facial one. See Reply Brief 24-25 ("[F]acial invalidation is the only way to ensure that the Texas requirements do not extinguish women's liberty").) The thrust of the Court's argument is that a trial judge can circumvent the rules of claim preclusion by granting a plaintiff relief on a claim that the plaintiff is barred from relitigating. Not surprisingly, the Court musters no authority for this proposition, which would undermine the interests that the doctrine of claim preclusion is designed to serve. A "fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive." Arizona v. California, 460 U.S. 605, 619, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). This interest in finality is equally offended regardless of whether the precluded claim is included in a complaint or inserted into the case by a judge.[4]
Another argument tossed off by the Court is that the judgment on the admitting privileges claim in the first case does not have preclusive effect because it was based on " 'the prematurity of the action.' " See ante, at 2304 - 2305 (quoting Restatement (Second) of Judgments § 20(2) ).
*2335 But this argument grossly mischaracterizes the basis for the judgment in the first case. The Court of Appeals did not hold that the facial challenge was premature. It held that the evidence petitioners offered was insufficient. See Abbott, 748 F.3d, at 598-599 ; see also n. 9, infra . Petitioners could have sought review in this Court, but elected not to do so.
This brings me to the Court's main argument-that the second facial challenge is a different claim because of "changed circumstances." What the Court means by this is that petitioners now have better evidence than they did at the time of the first case with respect to the number of clinics that would have to close as a result of the admitting privileges requirement. This argument is contrary to a cardinal rule of res judicata, namely, that a plaintiff who loses in a first case cannot later bring the same case simply because it has now gathered better evidence. Claim preclusion does not contain a "better evidence" exception. See, e.g., Torres v. Shalala, 48 F.3d 887, 894 (C.A.5 1995) ("If simply submitting new evidence rendered a prior decision factually distinct, res judicata would cease to exist"); Geiger v. Foley Hoag LLP Retirement Plan, 521 F.3d 60, 66 (C.A.1 2008) (Claim preclusion "applies even if the litigant is prepared to present different evidence ... in the second action"); Saylor v. United States, 315 F.3d 664, 668 (C.A.6 2003) ("The fact that ... new evidence might change the outcome of the case does not affect application of claim preclusion doctrine"); International Union of Operating Engineers-Employers Constr. Industry Pension, Welfare and Training Trust Funds v. Karr, 994 F.2d 1426, 1430 (C.A.9 1993) ("The fact that some different evidence may be presented in this action ..., however, does not defeat the bar of res judicata"); Restatement (Second) of Judgments § 25, Comment b ("A mere shift in the evidence offered to support a ground held unproved in a prior action will not suffice to make a new claim avoiding the preclusive effect of the judgment"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4403, p. 33 (2d ed. 2002) (Wright & Miller) (Res judicata "ordinarily applies despite the availability of new evidence"); Restatement of Judgments § 1, Comment b (The ordinary rules of claim preclusion apply "although the party against whom a judgment is rendered is later in a position to produce better evidence so that he would be successful in a second action").
In an effort to get around this hornbook rule, the Court cites a potpourri of our decisions that have no bearing on the question at issue. Some are not even about res judicata.[5] And the cases that do concern res judicata, Abie State Bank v. Bryan, 282 U.S. 765, 772, 51 S.Ct. 252, 75 L.Ed. 690 (1931), Lawlor v. National Screen Service Corp., 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), and Third Nat. Bank of Louisville v. Stone, 174 U.S. 432, 434, 19 S.Ct. 759, 43 L.Ed. 1035 (1899), endorse the unremarkable proposition that a prior judgment does not preclude new claims based on acts occurring after the time of the first judgment.[6] But petitioners' second *2336 facial challenge is not based on new acts postdating the first suit. Rather, it is based on the same underlying act, the enactment of H.B. 2, which allegedly posed an undue burden.
I come now to the authority on which the Court chiefly relies, Comment f to § 24 of the second Restatement. This is how it reads:
"Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first. See Illustrations 10-12. Where important human values-such as the lawfulness of a continuing personal disability or restraint-are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought." (Emphasis added.)
As the word I have highlighted-"may"-should make clear, this comment does not say that "[m]aterial operative facts occurring after the decision of an action" always or even usually form "the basis of a second action not precluded by the first." Rather, the comment takes the view that this "may" be so. Accord, ante, at 2305 ("[D]evelopment of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim" (emphasis added)). The question, then, is when the development of new material facts should lead to this conclusion. And there are strong reasons to conclude this should be a very narrow exception indeed. Otherwise, this statement, relegated to a mere comment, would revolutionize the rules of claim preclusion-by permitting a party to relitigate a lost claim whenever it obtains better evidence. Comment f was surely not meant to upend this fundamental rule.
What the comment undoubtedly means is far more modest-only that in a few, limited circumstances the development of new material facts should (in the opinion of the ALI) permit relitigation. What are these circumstances? Section 24 includes three illustrative examples in the form of hypothetical cases, and none resembles the present case.
In the first hypothetical case, the subsequent suit is based on new events that provide a basis for relief under a different legal theory. Restatement (Second) of Judgments § 24, Illustration 10.
In the second case, a father who lost a prior child custody case brings a second action challenging his wife's fitness as a mother based on "subsequent experience," which I take to mean subsequent conduct by the mother. Id., Illustration 11. This illustration is expressly linked to a determination of a person's "status"-and not even status in general, but a particular status, fitness as a parent, that the law recognizes as changeable. See Reporter's Note, id., § 24, Comment f (Illustration 11 "exemplifies the effect of changed circumstances in an action relating to status").
In the final example, the government loses a civil antitrust conspiracy case but then brings a second civil antitrust conspiracy case based on new conspiratorial acts. The illustration does not suggest that the legality of acts predating the end of the first case is actionable in the second case, only that the subsequent acts give rise to a new claim and that proof of earlier acts may be admitted as evidence *2337 to explain the significance of the later acts. Id ., Illustration 12.
The present claim is not similar to any of these illustrations. It does not involve a claim based on postjudgment acts and a new legal theory. It does not ask us to adjudicate a person's status. And it does not involve a continuing course of conduct to be proved by the State's new acts.
The final illustration actually undermines the Court's holding. The Reporter's Note links this illustration to a Fifth Circuit case, Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 421 F.2d 1313 (1970). In that case, the court distinguished between truly postjudgment acts and "acts which have been completed [prior to the previous judgment] except for their consequences." Id., at 1318. Only postjudgment acts-and not postjudgment consequences-the Fifth Circuit held, can give rise to a new cause of action. See ibid.[7]
Here, the Court does not rely on any new acts performed by the State of Texas after the end of the first case. Instead, the Court relies solely on what it takes to be new consequences, the closing of additional clinics, that are said to have resulted from the enactment of H.B. 2.
D
For these reasons, what the Court has done here is to create an entirely new exception to the rule that a losing plaintiff cannot relitigate a claim just because it now has new and better evidence. As best I can tell, the Court's new rule must be something like this: If a plaintiff initially loses because it failed to provide adequate proof that a challenged law will have an unconstitutional effect and if subsequent developments tend to show that the law will in fact have those effects, the plaintiff may relitigate the same claim. Such a rule would be unprecedented, and I am unsure of its wisdom, but I am certain of this: There is no possible justification for such a rule unless the plaintiff, at the time of the first case, could not have reasonably shown what the effects of the law would be. And that is not the situation in this case.
1
The Court does not contend that petitioners, at the time of the first case, could not have gathered and provided evidence that was sufficient to show that the admitting privileges requirement would cause a sufficient number of clinic closures. Instead, the Court attempts to argue that petitioners could not have shown at that time that a sufficient number of clinics had already closed . As I have explained, that is not what petitioners need to show or what they attempted to prove.
Moreover, the Court is also wrong in its understanding of petitioners' proof in the first case. In support of its holding that the admitting privileges requirement now "places a 'substantial obstacle in the path of a woman's choice,' " the Court relies on two facts: "Eight abortion clinics closed in *2338 the months leading up to the requirement's effective date" and "[e]leven more closed on the day the admitting-privileges requirement took effect." Ante, at 2312. But petitioners put on evidence addressing exactly this issue in their first trial. They apparently surveyed 27 of the 36 abortion clinics they identified in the State, including all 24 of the clinics owned by them or their coplaintiffs, to find out what impact the requirement would have on clinic operations. See Appendix, infra (App. K to Emergency Application To Vacate Stay in Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, O.T. 2013, No. 13A452, Plaintiffs' Trial Exh. 46).
That survey claimed to show that the admitting privileges requirement would cause 15 clinics to close.[8] See ibid. The Fifth Circuit had that evidence before it, and did not refuse to consider it.[9] If that evidence was sufficient to show that the admitting privileges rule created an unlawful impediment to abortion access (and the District Court indeed thought it sufficient), then the decision of the Fifth Circuit in the first case was wrong as a matter of law. Petitioners could have asked us to review that decision, but they chose not to do so. A tactical decision of that nature has consequences. While it does not mean that the admitting privileges requirement is immune to a facial challenge, it does mean that these petitioners and the other plaintiffs in the first case cannot mount such a claim.
2
Even if the Court thinks that petitioners' evidence in the first case was insufficient, *2339 the Court does not claim that petitioners, with reasonable effort, could not have gathered sufficient evidence to show with some degree of accuracy what the effects of the admitting privileges requirement would be. As I have just explained, in their first trial petitioners introduced a survey of 27 abortion clinics indicating that 15 would close because of the admitting privileges requirement. The Court does not identify what additional evidence petitioners needed but were unable to gather. There is simply no reason why petitioners should be allowed to relitigate their facial claim.
E
So far, I have discussed only the first of the two sentences in Comment f, but the Court also relies on the second sentence. I reiterate what that second sentence says:
"Where important human values-such as the lawfulness of a continuing personal disability or restraint-are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought." Restatement (Second) of Judgments § 24, Comment f .
The second Restatement offers no judicial support whatsoever for this suggestion, and thus the comment "must be regarded as a proposal for change rather than a restatement of existing doctrine, since the commentary refers to not a single case, of this or any other United States court." United States v. Stuart, 489 U.S. 353, 375, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (Scalia, J., concurring in judgment). The sentence also sits in considerable tension with our decisions stating that res judicata must be applied uniformly and without regard to what a court may think is just in a particular case. See, e.g., Moitie, 452 U.S., at 401, 101 S.Ct. 2424 ("The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case"). Not only did this sentence seemingly come out of nowhere, but it appears that no subsequent court has relied on this sentence as a ground for decision. And while a few decisions have cited the "important human values" language, those cases invariably involve the relitigation of personal status determinations, as discussed in Comment f 's Illustration 11. See, e.g., People ex rel. Leonard HH. v. Nixon, 148 App.Div.2d 75, 79-80, 543 N.Y.S.2d 998, 1001 (1989) ( "[B]y its very nature, litigation concerning the status of a person's mental capacity does not lend itself to strict application of res judicata on a transactional analysis basis").[10]
In sum, the Court's holding that petitioners' second facial challenge to the admitting privileges requirement is not barred by claim preclusion is not supported by any of our cases or any body of lower court precedent; is contrary to the bedrock rule that a party cannot relitigate *2340 a claim simply because the party has obtained new and better evidence; is contrary to the first Restatement of Judgments and the actual rules of the second Restatement of Judgment; and is purportedly based largely on a single comment in the second Restatement, but does not even represent a sensible reading of that comment. In a regular case, an attempt by petitioners to relitigate their previously unsuccessful facial challenge to the admitting privileges requirement would have been rejected out of hand-indeed, might have resulted in the imposition of sanctions under Federal Rule of Civil Procedure 11. No court would even think of reviving such a claim on its own. But in this abortion case, ordinary rules of law-and fairness-are suspended.
II
A
I now turn to the application of principles of claim preclusion to a claim that petitioners did include in their second complaint, namely, their facial challenge to the requirement in H.B. 2 that abortion clinics comply with the rules that govern ambulatory surgical centers (ASCs). As we have said many times, the doctrine of claim preclusion not only bars the relitigation of previously litigated claims; it can also bar claims that are closely related to the claims unsuccessfully litigated in a prior case. See Moitie, supra, at 398, 101 S.Ct. 2424 ; Montana, 440 U.S., at 153, 99 S.Ct. 970.
As just discussed, the Court's holding on the admitting privileges issue is based largely on a comment to § 24 of the second Restatement, and therefore one might think that consistency would dictate an examination of what § 24 has to say on the question whether the ASC challenge should be barred. But consistency is not the Court's watchword here.
Section 24 sets out the general rule regarding the " '[s]plitting' " of claims. This is the rule that determines when the barring of a claim that was previously litigated unsuccessfully also extinguishes a claim that the plaintiff could have but did not bring in the first case. Section 24(1) states that the new claim is barred if it is "any part of the transaction, or series of connected transactions, out of which the action arose."
Here, it is evident that petitioners' challenges to the admitting privileges requirement and the ASC requirement are part of the same transaction or series of connected transactions. If, as I believe, the "transaction" is the enactment of H.B. 2, then the two facial claims are part of the very same transaction. And the same is true even if the likely or actual effects of the two provisions constitute the relevant transactions. Petitioners argue that the admitting privileges requirement and the ASC requirements combined have the effect of unconstitutionally restricting access to abortions. Their brief repeatedly refers to the collective effect of the "requirements." Brief for Petitioners 40, 41, 42, 43, 44. They describe the admitting privileges and ASC requirements as delivering a "one-two punch." Id ., at 40. They make no effort whatsoever to separate the effects of the two provisions.
B
The Court nevertheless holds that there are two "meaningful differences" that justify a departure from the general rule against splitting claims. Ante, at 2307 - 2308. Neither has merit.
1
First, pointing to a statement in a pocket part to a treatise, the Court says that "courts normally treat challenges to distinct regulatory requirements as 'separate *2341 claims,' even when they are part of one overarching '[g]overnment regulatory scheme.' " Ante, at 2308 (quoting 18 Wright & Miller § 4408, at 54 (2d ed. 2002, Supp. 2016) ). As support for this statement, the treatise cites one case, Hamilton's Bogarts, Inc. v. Michigan, 501 F.3d 644, 650 (C.A.6 2007). Even if these authorities supported the rule invoked by the Court (and the Court points to no other authorities), they would hardly be sufficient to show that "courts normally" proceed in accordance with the Court's rule. But in fact neither the treatise nor the Sixth Circuit decision actually supports the Court's rule.
What the treatise says is the following:
"Government regulatory schemes provide regular examples of circumstances in which regulation of a single business by many different provisions should lead to recognition of separate claims when the business challenges different regulations." 18 Wright & Miller § 4408, at 54 (emphasis added).
Thus, the treatise expresses a view about what the law "should" be; it does not purport to state what courts "normally" do. And the recommendation of the treatise authors concerns different provisions of a "regulatory scheme," which often embodies an accumulation of legislative enactments. Petitioners challenge two provisions of one law, not just two provisions of a regulatory scheme.
The Sixth Circuit decision is even further afield. In that case, the plaintiff had previously lost a case challenging one rule of a state liquor control commission. 501 F.3d, at 649-650. On the question whether the final judgment in that case barred a subsequent claim attacking another rule, the court held that the latter claim was "likely" not barred because, "although [the first rule] was challenged in the first lawsuit, [the other rule] was not," and "[t]he state has not argued or made any showing that [the party] should also have challenged [the other rule] at the time." Id., at 650. To say that these authorities provide meager support for the Court's reasoning would be an exaggeration.
Beyond these paltry authorities, the Court adds only the argument that we should not "encourage a kitchen-sink approach to any litigation challenging the validity of statutes." Ante, at 2308. I agree-but that is not the situation in this case. The two claims here are very closely related. They are two parts of the same bill. They both impose new requirements on abortion clinics. They are justified by the State on the same ground, protection of the safety of women seeking abortions. They are both challenged as imposing the same kind of burden (impaired access to clinics) on the same kind of right (the right to abortion, as announced in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 ). And petitioners attack the two provisions as a package. According to petitioners, the two provisions were both enacted for the same illegitimate purpose-to close down Texas abortion clinics. See Brief for Petitioners 35-36. And as noted, petitioners rely on the combined effect of the two requirements. Petitioners have made little effort to identify the clinics that closed as a result of each requirement but instead aggregate the two requirements' effects.
For these reasons, the two challenges "form a convenient trial unit." Restatement (Second) of Judgments § 24(2). In fact, for a trial court to accurately identify the effect of each provision it would also need to identify the effect of the other provision. Cf. infra, at 2345 - 2346.
2
Second, the Court claims that, at the time when petitioners filed their complaint *2342 in the first case, they could not have known whether future rules implementing the surgical center requirement would provide an exemption for existing abortion clinics. Ante, at 2308. This argument is deeply flawed.
"Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Regional Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). And here, there was never any real chance that the Texas Department of State Health Services would exempt existing abortion clinics from all the ASC requirements. As the Court of Appeals wrote, "it is abundantly clear from H.B. 2 that all abortion facilities must meet the standards already promulgated for ASCs." Whole Woman's Health v. Cole, 790 F.3d 563, 583 (C.A.5 2015) (per curiam ) (case below). See Tex. Health & Safety Code Ann. § 245.010(a) (West Cum. Supp. 2015) (Rules implementing H.B. 2 "must contain minimum standards ... for an abortion facility [that are] equivalent to the minimum standards ... for ambulatory surgical centers"). There is no apparent basis for the argument that H.B. 2 permitted the state health department to grant blanket exemptions.
Whether there was any real likelihood that clinics would be exempted from particular ASC requirements is irrelevant because both petitioners and the Court view the ASC requirements as an indivisible whole. Petitioners told the Fifth Circuit in unequivocal terms that they were "challeng[ing] H.B. 2 broadly, with no effort whatsoever to parse out specific aspects of the ASC requirement that they f[ou]nd onerous or otherwise infirm." 790 F.3d, at 582. Similarly, the majority views all the ASC provisions as an indivisible whole. See ante, at 2319 ("The statute was meant to require abortion facilities to meet the integrated surgical-center standards-not some subset thereof"). On this view, petitioners had no reason to wait to see whether the Department of State Health Services might exempt them from some of the ASC rules. Even if exemptions from some of the ASC rules had been granted, petitioners and the majority would still maintain that the provision of H.B. 2 making the ASC rules applicable to abortion facilities is facially unconstitutional. Thus, exemption from some of the ASC requirements would be entirely inconsequential. The Court has no response to this point. See ante, at 2308.
For these reasons, petitioners' facial attack on the ASC requirements, like their facial attack on the admitting privileges rule, is precluded.
III
Even if res judicata did not bar either facial claim, a sweeping, statewide injunction against the enforcement of the admitting privileges and ASC requirements would still be unjustified. Petitioners in this case are abortion clinics and physicians who perform abortions. If they were simply asserting a constitutional right to conduct a business or to practice a profession without unnecessary state regulation, they would have little chance of success. See, e.g., Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Under our abortion cases, however, they are permitted to rely on the right of the abortion patients they serve. See Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) ; but see ante, at 2321 - 2323 (THOMAS, J., dissenting).
Thus, what matters for present purposes is not the effect of the H.B. 2 provisions on petitioners but the effect on their patients.
*2343 Under our cases, petitioners must show that the admitting privileges and ASC requirements impose an "undue burden" on women seeking abortions. Gonzales v. Carhart, 550 U.S. 124, 146, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). And in order to obtain the sweeping relief they seek-facial invalidation of those provisions-they must show, at a minimum, that these provisions have an unconstitutional impact on at least a "large fraction" of Texas women of reproductive age.[11] Id., at 167-168, 127 S.Ct. 1610. Such a situation could result if the clinics able to comply with the new requirements either lacked the requisite overall capacity or were located too far away to serve a "large fraction" of the women in question.
Petitioners did not make that showing. Instead of offering direct evidence, they relied on two crude inferences. First, they pointed to the number of abortion clinics that closed after the enactment of H.B. 2, and asked that it be inferred that all these closures resulted from the two challenged provisions. See Brief for Petitioners 23-24. They made little effort to show why particular clinics closed. Second, they pointed to the number of abortions performed annually at ASCs before H.B. 2 took effect and, because this figure is well below the total number of abortions performed each year in the State, they asked that it be inferred that ASC-compliant clinics could not meet the demands of women in the State. See App. 237-238. Petitioners failed to provide any evidence of the actual capacity of the facilities that would be available to perform abortions in compliance with the new law-even though they provided this type of evidence in their first case to the District Court at trial and then to this Court in their application for interim injunctive relief. Appendix, infra .
A
I do not dispute the fact that H.B. 2 caused the closure of some clinics. Indeed, it seems clear that H.B. 2 was intended to force unsafe facilities to shut down. The law was one of many enacted by States in the wake of the Kermit Gosnell scandal, in which a physician who ran an abortion clinic in Philadelphia was convicted for the first-degree murder of three infants who were born alive and for the manslaughter of a patient. Gosnell had *2344 not been actively supervised by state or local authorities or by his peers, and the Philadelphia grand jury that investigated the case recommended that the Commonwealth adopt a law requiring abortion clinics to comply with the same regulations as ASCs.[12] If Pennsylvania had had such a requirement in force, the Gosnell facility may have been shut down before his crimes. And if there were any similarly unsafe facilities in Texas, H.B. 2 was clearly intended to put them out of business.[13]
While there can be no doubt that H.B. 2 caused some clinics to cease operation, the absence of proof regarding the reasons for particular closures is a problem because some clinics have or may have closed for at least four reasons other than the two H.B. 2 requirements at issue here. These are:
1. H.B. 2's restriction on medication abortion. In their first case, petitioners challenged the provision of H.B. 2 that regulates medication abortion, but that part of the statute was upheld by the Fifth Circuit and not relitigated in this case. The record in this case indicates that in the first six months after this restriction took effect, the number of medication abortions dropped by 6,957 (compared to the same period the previous year). App. 236.
2. Withdrawal of Texas family planning funds. In 2011, Texas passed a law preventing family planning grants to providers that perform abortions and their affiliates. In the first case, petitioners' expert admitted that some clinics closed "as a result of the defunding,"[14] and as discussed below, this withdrawal appears specifically to have caused multiple clinic closures in West Texas. See infra, at 2345, and n. 18.
3. The nationwide decline in abortion demand. Petitioners' expert testimony relies[15] on a study from the Guttmacher Institute which concludes that " '[t]he national abortion rate has resumed its decline, and no evidence was found that the overall drop in abortion incidence was related to the decrease in providers or to restrictions implemented between 2008 and 2011 .' " App. 1117 (direct testimony of Dr. Peter Uhlenberg) (quoting R. Jones & J. Jerman, Abortion Incidence and Service Availability In the United States, 2011, 46 Perspectives on Sexual and Reproductive Health 3 (2014); emphasis in testimony). Consistent with that trend, "[t]he number of abortions to residents of Texas declined by 4,956 between 2010 and 2011 and by 3,905 between 2011 and 2012." App. 1118.
4. Physician retirement (or other localized factors). Like everyone else, most physicians eventually retire, and the retirement of a physician who performs *2345 abortions can cause the closing of a clinic or a reduction in the number of abortions that a clinic can perform. When this happens, the closure of the clinic or the reduction in capacity cannot be attributed to H.B. 2 unless it is shown that the retirement was caused by the admitting privileges or surgical center requirements as opposed to age or some other factor.
At least nine Texas clinics may have ceased performing abortions (or reduced capacity) for one or more of the reasons having nothing to do with the provisions challenged here. For example, in their first case, petitioners alleged that the medication-abortion restriction would cause at least three medication-only abortion clinics to cease performing abortions,[16] and they predicted that "[o]ther facilities that offer both surgical and medication abortion will be unable to offer medication abortion,"[17] presumably reducing their capacity. It also appears that several clinics (including most of the clinics operating in West Texas, apart from El Paso) closed in response to the unrelated law restricting the provision of family planning funds.[18] And there is reason to question whether at least two closures (one in Corpus Christi and one in Houston) may have been prompted by physician retirements.[19]
Neither petitioners nor the District Court properly addressed these complexities in assessing causation-and for no good reason. The total number of abortion clinics in the State was not large. Petitioners could have put on evidence (as they did for 27 individual clinics in their first case, see Appendix, infra ) about the challenged provisions' role in causing the closure of each clinic,[20] and the court could have made a factual finding as to the cause of each closure.
Precise findings are important because the key issue here is not the number or percentage of clinics affected, but the effect of the closures on women seeking *2346 abortions, i.e., on the capacity and geographic distribution of clinics used by those women. To the extent that clinics closed (or experienced a reduction in capacity) for any reason unrelated to the challenged provisions of H.B. 2, the corresponding burden on abortion access may not be factored into the access analysis. Because there was ample reason to believe that some closures were caused by these other factors, the District Court's failure to ascertain the reasons for clinic closures means that, on the record before us, there is no way to tell which closures actually count. Petitioners-who, as plaintiffs, bore the burden of proof-cannot simply point to temporal correlation and call it causation.
B
Even if the District Court had properly filtered out immaterial closures, its analysis would have been incomplete for a second reason. Petitioners offered scant evidence on the capacity of the clinics that are able to comply with the admitting privileges and ASC requirements, or on those clinics' geographic distribution. Reviewing the evidence in the record, it is far from clear that there has been a material impact on access to abortion.
On clinic capacity, the Court relies on petitioners' expert Dr. Grossman, who compared the number of abortions performed at Texas ASCs before the enactment of H.B. 2 (about 14,000 per year) with the total number of abortions per year in the State (between 60,000-70,000 per year). Ante, at 2316 - 2317.[21] Applying what the Court terms "common sense," the Court infers that the ASCs that performed abortions at the time of H.B. 2's enactment lacked the capacity to perform all the abortions sought by women in Texas.
The Court's inference has obvious limitations. First, it is not unassailable "common *2347 sense" to hold that current utilization equals capacity; if all we know about a grocery store is that it currently serves 200 customers per week, ante, at 2316 - 2317, that fact alone does not tell us whether it is an overcrowded minimart or a practically empty supermarket. Faced with increased demand, ASCs could potentially increase the number of abortions performed without prohibitively expensive changes. Among other things, they might hire more physicians who perform abortions,[22] utilize their facilities more intensively or efficiently, or shift the mix of services provided. Second, what matters for present purposes is not the capacity of just those ASCs that performed abortions prior to the enactment of H.B. 2 but the capacity of those that would be available to perform abortions after the statute took effect. And since the enactment of H.B. 2, the number of ASCs performing abortions has increased by 50%-from six in 2012 to nine today.[23]
The most serious problem with the Court's reasoning is that its conclusion is belied by petitioners' own submissions to this Court. In the first case, when petitioners asked this Court to vacate the Fifth Circuit's stay of the District Court's injunction of the admitting privileges requirement pending appeal, they submitted a chart previously provided in the District Court that detailed the capacity of abortion clinics after the admitting privileges requirement was to take effect.[24] This chart is included as an Appendix to this opinion.[25] Three of the facilities listed on *2348 the chart were ASCs, and their capacity was shown as follows:
• Southwestern Women's Surgery Center in Dallas was said to have the capacity for 5,720 abortions a year (110 per week);
• Planned Parenthood Surgical Health Services Center in Dallas was said to have the capacity for 6,240 abortions a year (120 per week); and
• Planned Parenthood Center for Choice in Houston was said to have the capacity for 9,100 abortions a year (175 per week).[26] See Appendix, infra .
The average capacity of these three ASCs was 7,020 abortions per year.[27] If the nine ASCs now performing abortions in Texas have the same average capacity, they have a total capacity of 63,180. Add in the assumed capacity for two other clinics that are operating pursuant to the judgment of the Fifth Circuit (over 3,100 abortions per year),[28] and the total for the State is 66,280 abortions per year. That is comparable to the 68,298 total abortions performed in Texas in 2012, the year before H.B. 2 was enacted, App. 236,[29] and well in excess of the abortion rate one would expect-59,070-if subtracting the apparent impact of the medication abortion restriction, see n. 21, supra .
To be clear, I do not vouch for the accuracy of this calculation. It might be too high or too low. The important point is that petitioners put on evidence of actual clinic capacity in their earlier case, and there is no apparent reason why they could not have done the same here. Indeed, the Court asserts that, after the admitting privileges requirement took effect, clinics "were not able to accommodate increased demand," ante, at 2318, but petitioners' own evidence suggested that the *2349 requirement had no effect on capacity, see n. 21, supra . On this point, like the question of the reason for clinic closures, petitioners did not discharge their burden, and the District Court did not engage in the type of analysis that should have been conducted before enjoining an important state law.
So much for capacity. The other[30] potential obstacle to abortion access is the distribution of facilities throughout the State. This might occur if the two challenged H.B. 2 requirements, by causing the closure of clinics in some rural areas, led to a situation in which a "large fraction"[31] of women of reproductive age live too far away from any open clinic. Based on the Court's holding in Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674, it appears that the need to travel up to 150 miles is not an undue burden,[32] and the evidence in this case shows that if the only clinics in the State were those that would have remained open if the judgment of the Fifth Circuit had not been enjoined, roughly 95% of the women of reproductive age in the State would live within 150 miles of an open facility (or lived outside that range before H.B. 2).[33] Because the record does not show why particular facilities closed, the real figure may be even higher than 95%.
We should decline to hold that these statistics justify the facial invalidation of the H.B. 2 requirements. The possibility that the admitting privileges requirement might have caused a closure in Lubbock is *2350 no reason to issue a facial injunction exempting Houston clinics from that requirement. I do not dismiss the situation of those women who would no longer live within 150 miles of a clinic as a result of H.B. 2. But under current doctrine such localized problems can be addressed by narrow as-applied challenges.
IV
Even if the Court were right to hold that res judicata does not bar this suit and that H.B. 2 imposes an undue burden on abortion access-it is, in fact, wrong on both counts-it is still wrong to conclude that the admitting privileges and surgical center provisions must be enjoined in their entirety. H.B. 2 has an extraordinarily broad severability clause that must be considered before enjoining any portion or application of the law. Both challenged provisions should survive in substantial part if the Court faithfully applies that clause. Regrettably, it enjoins both in full, heedless of the (controlling) intent of the state legislature. Cf. Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam ) ("Severability is of course a matter of state law").
A
Applying H.B. 2's severability clause to the admitting privileges requirement is easy. Simply put, the requirement must be upheld in every city in which its application does not pose an undue burden. It surely does not pose that burden anywhere in the eastern half of the State, where most Texans live and where virtually no woman of reproductive age lives more than 150 miles from an open clinic. See App. 242, 244 (petitioners' expert testimony that 82.5% of Texas women of reproductive age live within 150 miles of open clinics in Austin, Dallas, Fort Worth, Houston, and San Antonio). (Unfortunately, the Court does not address the State's argument to this effect. See Brief for Respondents 51.) And petitioners would need to show that the requirement caused specific West Texas clinics to close (but see supra, at 2345, and n. 18) before they could be entitled to an injunction tailored to address those closures.
B
Applying severability to the surgical center requirement calls for the identification of the particular provisions of the ASC regulations that result in the imposition of an undue burden. These regulations are lengthy and detailed, and while compliance with some might be expensive, compliance with many others would not. And many serve important health and safety purposes. Thus, the surgical center requirements cannot be judged as a package. But the District Court nevertheless held that all the surgical center requirements are unconstitutional in all cases, and the Court sustains this holding on grounds that are hard to take seriously.
When the Texas Legislature passed H.B. 2, it left no doubt about its intent on the question of severability. It included a provision mandating the greatest degree of severability possible. The full provision is reproduced below,[34] but it is enough to *2351 note that under this provision "every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act, are severable from each other." H.B. 2, § 10(b), App. to Pet. for Cert. 200a. And to drive home the point about the severability of applications of the law, the provision adds:
"If any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone." Ibid.
This provision indisputably requires that all surgical center regulations that are not themselves unconstitutional be left standing. Requiring an abortion facility to comply with any provision of the regulations applicable to surgical centers is an "application of the provision" of H.B. 2 that requires abortion clinics to meet surgical center standards. Therefore, if some such applications are unconstitutional, the severability clause plainly requires that those applications be severed and that the rest be left intact.
How can the Court possibly escape this painfully obvious conclusion? Its main argument is that it need not honor the severability provision because doing so would be too burdensome. See ante, at 2319 - 2320. This is a remarkable argument.
Under the Supremacy Clause, federal courts may strike down state laws that violate the Constitution or conflict with federal statutes, Art. VI, cl. 2, but in exercising this power, federal courts must take great care. The power to invalidate a state law implicates sensitive federal-state relations. Federal courts have no authority to carpet-bomb state laws, knocking out provisions that are perfectly consistent *2352 with federal law, just because it would be too much bother to separate them from unconstitutional provisions.
In any event, it should not have been hard in this case for the District Court to separate any bad provisions from the good. Petitioners should have identified the particular provisions that would entail what they regard as an undue expense, and the District Court could have then concentrated its analysis on those provisions. In fact, petitioners did do this in their trial brief, Doc. 185, p. 8 in Lakey (Aug. 12, 2014) ("It is the construction and nursing requirements that form the basis of Plaintiffs' challenge"), but they changed their position once the District Court awarded blanket relief, see 790 F.3d, at 582 (petitioners told the Fifth Circuit that they "challenge H.B. 2 broadly, with no effort whatsoever to parse out specific aspects of the ASC requirement that they find onerous or otherwise infirm"). In its own review of the ASC requirement, in fact, the Court follows petitioners' original playbook and focuses on the construction and nursing requirements as well. See ante, at 2314 - 2315 (detailed walkthrough of Tex. Admin. Code, tit. 25, §§ 135.15 (2016) (nursing), 135.52 (construction) ). I do not see how it "would inflict enormous costs on both courts and litigants,"ante, at 2319, to single out the ASC regulations that this Court and petitioners have both targeted as the core of the challenge.
By forgoing severability, the Court strikes down numerous provisions that could not plausibly impose an undue burden. For example, surgical center patients must "be treated with respect, consideration, and dignity." Tex. Admin. Code, tit. 25, § 135.5(a). That's now enjoined. Patients may not be given misleading "advertising regarding the competence and/or capabilities of the organization." § 135.5(g). Enjoined. Centers must maintain fire alarm and emergency communications systems, §§ 135.41(d), 135.42(e), and eliminate "[h]azards that might lead to slipping, falling, electrical shock, burns, poisoning, or other trauma," § 135.10(b). Enjoined and enjoined. When a center is being remodeled while still in use, "[t]emporary sound barriers shall be provided where intense, prolonged construction noises will disturb patients or staff in the occupied portions of the building." § 135.51(b)(3)(B)(vi). Enjoined. Centers must develop and enforce policies concerning teaching and publishing by staff. §§ 135.16(a), (c). Enjoined. They must obtain informed consent before doing research on patients. § 135.17(e). Enjoined. And each center "shall develop, implement[,] and maintain an effective, ongoing, organization-wide, data driven patient safety program." § 135.27(b). Also enjoined. These are but a few of the innocuous requirements that the Court invalidates with nary a wave of the hand.
Any responsible application of the H.B. 2 severability provision would leave much of the law intact. At a minimum, both of the requirements challenged here should be held constitutional as applied to clinics in any Texas city that will have a surgical center providing abortions (i.e., those areas in which there cannot possibly have been an undue burden on abortion access). Moreover, as even the District Court found, the surgical center requirement is clearly constitutional as to new abortion facilities and facilities already licensed as surgical centers. Whole Woman's Health v. Lakey, 46 F.Supp.3d 673, 676 (W.D.Tex.2014). And we should uphold every application of every surgical center regulation that does not pose an undue burden-at the very least, all of the regulations as to which petitioners have never made a specific complaint supported by specific evidence.
*2353 The Court's wholesale refusal to engage in the required severability analysis here revives the "antagonistic 'canon of construction under which in cases involving abortion, a permissible reading of a statute is to be avoided at all costs.' " Gonzales, 550 U.S., at 153-154, 127 S.Ct. 1610 (quoting Stenberg v. Carhart, 530 U.S. 914, 977, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (KENNEDY, J., dissenting); some internal quotation marks omitted).
If the Court is unwilling to undertake the careful severability analysis required, that is no reason to strike down all applications of the challenged provisions. The proper course would be to remand to the lower courts for a remedy tailored to the specific facts shown in this case, to "try to limit the solution to the problem." Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 328, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006).
V
When we decide cases on particularly controversial issues, we should take special care to apply settled procedural rules in a neutral manner. The Court has not done that here.
I therefore respectfully dissent.
APPENDIX
App. K to Emergency Application To Vacate Stay in O.T. 2013, No. 13A452, Plaintiffs' Trial Exh. 46
Clinic Name Clinic Location Capacity after Privileges Requirement Notes Austin Women's Health Center Austin, TX 100% of prior capacity International Healthcare Solutions Austin, TX South Austin Health Center (PP] Austin, TX none Whole Women's Health Austin Austin, TX 100% of prior capacity Whole Women's Health Beaumont Beaumont, TX 100% of prior capacity Coastal Birth Control Center Corpus Christi, TX prob. 100% of prior capacity Abortion Advantage Dallas, TX none Northpark Medical Group Dallas, TX Dallas Surgical Health Services Center Dallas, TX 120 per week Routh Street Women's Clinic Dallas, TX 20 per week Down from 60 per week Southwestern Women's Dallas, TX 110 per week Hill Top Women's Reproductive Health Services El Paso, TX prob. 100% of prior capacity Reproductive Services El Paso, TX none Southwest Fort Worth Health Center (PP) Fort Worth, TX none West Side Clinic Fort Worth, TX none Whole Women's Health Fort Worth Fort Worth, TX none Harlingen Reproductive Services Harlingen, TX none Affordable Women's Health center Houston, TX AAA Concerned Women's Center Houston, TX Aaron Women's Clinic Houston, TX Texas Ambulatory Surgical Center Houston, TX Alto Women's Center Houston, TX Houston Women's Clinic Houston, TX 130 per week Planned Parenthood Center For Choice Houston, TX 175 per week Suburban Women's Clinic (SW) Houston, TX Suburban Women's Clinic (NW) Houston, TX Planned Parenthood Center for Choice Stafford Stafford (not in county) none Killeen Women's Health Center Killeen, TX none Planned Parenthood Women's Health Center Lubbock, TX none Whole Women's Health of McAllen McAllen, TX none Dr. Braid (Alamo Women's Reproductive Services) San Antonio, TX 100% of prior capacity Planned Parenthood Babock Sexual 40/week for ALL San Antonio PP Healthcare San Antonio, TX locations Planned Parenthood Bandera Rd Sexual Healthcare San Antonio, TX none Planned Parenthood Northeast Sexual Healthcare San Antonio, TX none Whole Woman's Health San Antonio San Antonio, TX severely limited Audre Rapoport Women's Health Center(PP) Waco, TX none

Compare, e.g., Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), and Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ; Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (assuming that physicians and clinics can vicariously assert women's right to abortion), with, e.g., Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam ); Hodgson v. Minnesota, 497 U.S. 417, 429, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) ; H.L. v. Matheson, 450 U.S. 398, 400, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) ; Williams v. Zbaraz, 448 U.S. 358, 361, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980) ; Harris v. McRae, 448 U.S. 297, 303, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ; Bellotti v. Baird, 428 U.S. 132, 137-138, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) ; Poelker v. Doe, 432 U.S. 519, 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (per curiam ); Beal v. Doe, 432 U.S. 438, 441-442, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) ; Maher v. Roe, 432 U.S. 464, 467, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (women seeking abortions have capably asserted their own rights, as plaintiffs).

See Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1278-1291 (2007) ; see also Linzer, The Carolene Products Footnote and the Preferred Position of Individual Rights: Louis Lusky and John Hart Ely vs. Harlan Fiske Stone, 12 Const. Commentary 277, 277-278, 288-300 (1995) ; Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 544, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (Stone, C.J., concurring) (citing the Carolene Products footnote to suggest that the presumption of constitutionality did not fully apply to encroachments on the unenumerated personal liberty to procreate).

See, e.g., Note, Developments in the Law: Res Judicata, 65 Harv. L. Rev. 818, 824 (1952) ; Cleary, Res Judicata Reexamined, 57 Yale L.J. 339, 339-340 (1948).

Brief for Plaintiffs-Appellees in Abbott, No. 13-51008 (CA5), p. 5 (emphasis added); see also id., at 23-24 ("[T]he evidence established that as a result of the admitting privileges requirement, approximately one-third of the licensed abortion providers in Texas would stop providing abortions.... As a result, one in three women in Texas would be unable to access desired abortion services.... [T]he immediate, widespread reduction of services caused by the admitting privileges requirement would produce a shortfall in the capacity of providers to serve all of the women seeking abortions" (emphasis added)).

Even if the "operative facts" were actual clinic closures, the claims in the two cases would still be the same. The Court suggests that many clinics closed between the time of the Fifth Circuit's decision in the first case and the time of the District Court's decision in the present case by comparing what the Court of Appeals said in Abbott about the effect of the admitting privileges requirement alone, 748 F.3d, at 598 ("All of the major Texas cities ... continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges"), with what the District Court said in this case about the combined effect of the admitting privileges requirement and the ambulatory surgical center requirement, 46 F.Supp.3d 673, 680 (W.D.Tex.2014) (Were the surgical center requirement to take effect on September 1, 2014, only seven or eight clinics would remain open). See ante, at 2306 - 2307. Obviously, this comparison does not show that the effect of the admitting privileges requirement alone was greater at the time of the District Court's decision in this second case. Simply put, the Court presents no new clinic closures allegedly caused by the admitting privileges requirement beyond those already accounted for in Abbott, as I discuss, infra, at 2307 - 2308, and accompanying notes.

I need not quibble with the Court's authorities stating that facial relief can sometimes be appropriate even where a plaintiff has requested only as-applied relief. Ante, at 2307. Assuming that this is generally proper, it does not follow that this may be done where the plaintiff is precluded by res judicata from bringing a facial claim.

See ante, at 2306 (citing United States v. Carolene Products Co., 304 U.S. 144, 153, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), and Nashville, C. & St. L.R. Co. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 79 L.Ed. 949 (1935) ).

The Court's contaminated-water hypothetical, see ante, at 2305 - 2306, may involve such a situation. If after their loss in the first suit, the same prisoners continued to drink the water, they would not be barred from suing to recover for subsequent injuries suffered as a result. But if the Court simply means that the passage of time would allow the prisoners to present better evidence in support of the same claim, the successive suit would be barred for the reasons I have given. In that event, their recourse would be to move for relief from the judgment. See Restatement (Second) of Judgments § 73.

See also Sutliffe v. Epping School Dist., 584 F.3d 314, 328 (C.A.1 2009) ("[W]hen a defendant is accused of ... acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action, and the events are said to constitute but one transaction" (internal quotation marks omitted)); Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 289 (C.A.2 2000) ("Plaintiffs' assertion of new incidents arising from the application of the challenged policy is also insufficient to bar the application of res judicata "); Huck v. Dawson, 106 F.3d 45, 49 (C.A.3 1997) (applying res judicata where "the same facts that resulted in the earlier judgment have caused continued damage").

As I explain, infra, at 2345, and n. 18, some of the closures presumably included in the Court's count of 19 were not attributed to H.B. 2 at the first trial, even by petitioners.

The Abbott panel's refusal to consider "developments since the conclusion of the bench trial," 748 F.3d, at 599, n. 14, was not addressed to the evidence of 15 closures presented at trial. The Court of Appeals in fact credited that evidence by assuming "some clinics may be required to shut their doors," but it nevertheless concluded that "there is no showing whatsoever that any woman will lack reasonable access to a clinic within Texas." Id., at 598. The Abbott decision therefore accepted the factual premise common to these two actions-namely, that the admitting privileges requirement would cause some clinics to close-but it concluded that petitioners had not proved a burden on access regardless. In rejecting Abbott 's conclusion, the Court seems to believe that Abbott also must have refused to accept the factual premise. See ante, at 2306 - 2307.
Instead, Abbott 's footnote 14 appears to have addressed the following post-trial developments: (1) the permanent closure of the Lubbock clinic, Brief for Plaintiffs-Appellees in Abbott (CA5), at 5, n. 3 (accounted for among the 15 anticipated closures, see Appendix, infra ); (2) the resumption of abortion services in Fort Worth, Brief for Plaintiffs-Appellees, at 5, n. 3; (3) the acquisition of admitting privileges by an Austin abortion provider, id., at 6, n. 4; (4) the acquisition of privileges by physicians in Dallas and San Antonio, see Letter from J. Crepps to L. Cayce, Clerk of Court in Abbott (CA5, Jan. 3, 2014); (5) the acquisition of privileges by physicians in El Paso and Killeen, see Letter from J. Crepps to L. Cayce, Clerk of Court in Abbott (CA5, Mar. 21, 2014); and (6) the enforcement of the requirement against one Houston provider who lacked privileges, see ibid. (citing Texas Medical Board press release). In the five months between the admitting privileges requirement taking effect and the Fifth Circuit's Abbott decision, then, the parties had ample time to inform that court of post-trial developments-and petitioners never identified the 15 closures as new (because the closures were already accounted for in their trial evidence). In fact, the actual new developments largely favored the State's case: In that time, physicians in Austin, Dallas, El Paso, Fort Worth, Killeen, and San Antonio were able to come into compliance, while only one in Houston was not, and one clinic (already identified at trial as expected to close) closed permanently. So Abbott 's decision to ignore post-trial developments quite likely favored petitioners.

See also In re Marriage of Shaddle, 317 Ill.App.3d 428, 430-432, 251 Ill.Dec. 444, 740 N.E.2d 525, 528-529 (2000) (child custody);In re Hope M., 1998 ME 170, ¶ 5, 714 A.2d 152, 154 (termination of parental rights);In re Connors, 255 Ill.App.3d 781, 784-785, 194 Ill.Dec. 529, 627 N.E.2d 1171, 1173-1174 (1994) (civil commitment); Kent V. v. State, 233 P.3d 597, 601, and n. 12 (Alaska 2010) (applying Comment f to termination of parental rights); In re Juvenile Appeal (83-DE), 190 Conn. 310, 318-319, 460 A.2d 1277, 1282 (1983) (same); In re Strozzi, 112 N.M. 270, 274, 814 P.2d 138, 142 (App.1991) (guardianship and conservatorship); Andrulonis v. Andrulonis, 193 Md.App. 601, 617, 998 A.2d 898, 908 (2010) (modification of alimony);In re Marriage of Pedersen, 237 Ill.App.3d 952, 957, 178 Ill.Dec. 835, 605 N.E.2d 629, 633 (1992) (same); Friederwitzer v. Friederwitzer, 55 N.Y.2d 89, 94-95, 447 N.Y.S.2d 893, 432 N.E.2d 765, 768 (1982) (child custody).
* * *

The proper standard for facial challenges is unsettled in the abortion context. See Gonzales, 550 U.S., at 167-168, 127 S.Ct. 1610 (comparing Ohio v. Akron Center for Reproductive Health, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid" (internal quotation marks omitted)), with Casey, 505 U.S., at 895, 112 S.Ct. 2791 (opinion of the Court) (indicating a spousal-notification statute would impose an undue burden "in a large fraction of the cases in which [it] is relevant" and holding the statutory provision facially invalid)). Like the Court in Gonzales, supra, at 167-168, 127 S.Ct. 1610 I do not decide the question, and use the more plaintiff-friendly "large fraction" formulation only because petitioners cannot meet even that test.
The Court, by contrast, applies the "large fraction" standard without even acknowledging the open question. Ante, at 2320. In a similar vein, it holds that the fraction's "relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.' " Ibid. (quoting Casey, 505 U.S., at 895, 112 S.Ct. 2791 ). I must confess that I do not understand this holding. The purpose of the large-fraction analysis, presumably, is to compare the number of women actually burdened with the number potentially burdened. Under the Court's holding, we are supposed to use the same figure (women actually burdened) as both the numerator and the denominator. By my math, that fraction is always "1," which is pretty large as fractions go.

Report of Grand Jury in No. 0009901-2008 (1st Jud. Dist. Pa., Jan. 14, 2011), p. 248-249, online at http://www.phila.gov/districtattorney/pdfs/grandjurywomensmedical.pdf (all Internet materials as last visited June 24, 2016).

See House Research Org., Laubenberg et al., Bill Analysis 10 (July 9, 2013), online at http://www.hro.house.state.tx.us/pdf/ba832/hb0002.pdf ("Higher standards could prevent the occurrence of a situation in Texas like the one recently exposed in Philadelphia, in which Dr. Kermit Gosnell was convicted of murder after killing babies who were born alive. A patient also died at that substandard clinic"). The Court attempts to distinguish the Gosnell horror story by pointing to differences between Pennsylvania and Texas law. See ante, at 2313 - 2314. But Texas did not need to be in Pennsylvania's precise position for the legislature to rationally conclude that a similar law would be helpful.

Rebuttal Decl. of Dr. Joseph E. Potter, Doc. 76-2, p. 12, ¶ 32, in Abbott (WD Tex., Oct. 18, 2013) (Potter Rebuttal Decl.).

See App. 234, 237, 253.

Complaint and Application for Preliminary and Permanent Injunction in Abbott (WD Tex.), ¶¶ 10, 11 (listing one clinic in Stafford and two in San Antonio).

Id., ¶ 88.

In the first case, petitioners apparently did not even believe that the abortion clinics in Abilene, Bryan, Midland, and San Angelo were made to close because of H.B. 2. In that case, petitioners submitted a list of 15 clinics they believed would close (or have severely limited capacity) because of the admitting privileges requirement-and those four West Texas clinics are not on the list. See Appendix, infra . And at trial, a Planned Parenthood executive specifically testified that the Midland clinic closed because of the funding cuts and because the clinic's medical director retired. See 1 Tr. 91, 93, in Abbott (WD Tex., Oct. 21, 2013). Petitioners' list and Planned Parenthood's testimony both fit with petitioners' expert's admission in the first case that some clinics closed "as a result of the defunding." Potter Rebuttal Decl. ¶ 32.

See Stoelje, Abortion Clinic Closes in Corpus Christi, San Antonio Express-News (June 10, 2014), online at http://www.mysanantonio.com/news/local/article/Abortion-clinic-closes-in-Corpus-Christi-5543125.php (provider "retiring for medical reasons"); 1 Plaintiffs' Exh. 18, p. 2, in Whole Woman's Health v. Lakey, No. 1:14-cv-284 (WD Tex., admitted into evidence Aug. 4, 2014) (e-mail stating Houston clinic owner "is retiring his practice"). Petitioners should have been required to put on proof about the reason for the closure of particular clinics. I cite the extrarecord Corpus Christi story only to highlight the need for such proof.

This kind of evidence was readily available; in fact, petitioners deposed at least one nonparty clinic owner about the burden posed by H.B. 2. See App. 1474. And recall that in their first case, petitioners put on evidence purporting to show how the admitting privileges requirement would (or would not) affect 27 clinics. See Appendix, infra (petitioners' chart of clinics).

In the first case, petitioners submitted a report that Dr. Grossman coauthored with their testifying expert, Dr. Potter. 1 Tr. 38 in Lakey (Aug. 4, 2014) (Lakey Tr.). That report predicted that "the shortfall in capacity due to the admitting privileges requirement will prevent at least 22,286 women" from accessing abortion. Decl. of Dr. Joseph E. Potter, Doc. 9-8, p. 4, in Abbott (WD Tex., Oct. 1, 2013). The methodology used was questionable. See Potter Rebuttal Decl. ¶ 18. As Dr. Potter admitted: "There's no science there. It's just evidence." 2 Tr. 23 in Abbott (WD Tex., Oct. 22, 2013). And in this case, in fact, Dr. Grossman admitted that their prediction turned out to be wildly inaccurate. Specifically, he provided a new figure (approximately 9,200) that was less than half of his earlier prediction. 1 Lakey Tr. 41. And he then admitted that he had not proven any causal link between the admitting privileges requirement and that smaller decline. Id., at 54 (quoting Grossman et al., Change in Abortion Services After Implementation of a Restrictive Law in Texas, 90 Contraception 496, 500 (2014)).
Dr. Grossman's testimony in this case, furthermore, suggested that H.B. 2's restriction on medication abortion (whose impact on clinics cannot be attributed to the provisions challenged in this case) was a major cause in the decline in the abortion rate. After the medication abortion restriction and admitting privileges requirement took effect, over the next six months the number of medication abortions dropped by 6,957 compared to the same period in the previous year. See App. 236. The corresponding number of surgical abortions rose by 2,343. See ibid. If that net decline of 4,614 in six months is doubled to approximate the annual trend (which is apparently the methodology Dr. Grossman used to arrive at his 9,200 figure, see 90 Contraception, supra, at 500), then the year's drop of 9,228 abortions seems to be entirely the product of the medication abortion restriction. Taken together, these figures make it difficult to conclude that the admitting privileges requirement actually depressed the abortion rate at all .
In light of all this, it is unclear why the Court takes Dr. Grossman's testimony at face value.

The Court asserts that the admitting privileges requirement is a bottleneck on capacity, ante, at 2317, but it musters no evidence and does not even dispute petitioners' own evidence that the admitting privileges requirement may have had zero impact on the Texas abortion rate, n. 21, supra .

See Brief for Petitioners 23-24 (six centers in 2012, compared with nine today). Two of the three new surgical centers opened since this case was filed are operated by Planned Parenthood (which now owns five of the nine surgical centers in the State). See App. 182-183, 1436. Planned Parenthood is obviously able to comply with the challenged H.B. 2 requirements. The president of petitioner Whole Woman's Health, a much smaller entity, has complained that Planned Parenthood " 'put[s] local independent businesses in a tough situation.' " Simon, Planned Parenthood Hits Suburbia, Wall Street Journal Online (June 23, 2008) (cited in Brief for CitizenLink et al. as Amici Curiae 15-16, and n. 23). But as noted, petitioners in this case are not asserting their own rights but those of women who wish to obtain an abortion, see supra, at 2342 - 2343, and thus the effect of the H.B. 2 requirements on petitioners' business and professional interests are not relevant.

See Appendix, infra . The Court apparently brushes off this evidence as "outside the record," ante, at 2317, but it was filed with this Court by the same petitioners in litigation closely related to this case. And "we may properly take judicial notice of the record in that litigation between the same parties who are now before us." Shuttlesworth v. Birmingham, 394 U.S. 147, 157, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ; see also, e.g., United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796 (1942) ; Freshman v. Atkins, 269 U.S. 121, 124, 46 S.Ct. 41, 70 L.Ed. 193 (1925).

The chart lists the 36 abortion clinics apparently open at the time of trial, and identifies the "Capacity after Privileges Requirement" for 27 of those clinics. Of those 27 clinics, 24 were owned by plaintiffs in the first case, and 3 (Coastal Birth Control Center, Hill Top Women's Reproductive Health Services, and Harlingen Reproductive Services) were owned by nonparties. It is unclear why petitioners' chart did not include capacity figures for the other nine clinics (also owned by non-parties). Under Federal Rule of Civil Procedure 30(b)(6), petitioners should have been able to depose representatives of those clinics to determine those clinics' capacity and their physicians' access to admitting privileges. In the present case, petitioners in fact deposed at least one such nonparty clinic owner, whose testimony revealed that he was able to comply with the admitting privileges requirement. See App. 1474 (testimony of El Paso abortion clinic owner, confirming that he possesses admitting privileges "at every hospital in El Paso" (filed under seal)). The chart states that 14 of those clinics would not be able to perform abortions if the requirement took effect, and that another clinic would have "severely limited" capacity. See Appendix, infra .

The Court nakedly asserts that this clinic "does not represent most facilities." Ante, at 2318. Given that in this case petitioners did not introduce evidence on "most facilities," I have no idea how the Court arrives at this conclusion.

The Court chides me, ante, at 2317 - 2318, for omitting the Whole Woman's Health ASC in San Antonio from this average. As of the Abbott trial in 2013, that ASC's capacity was (allegedly) to be "severely limited" by the admitting privileges requirement. See Appendix, infra (listing "Capacity after Privileges Requirement"). But that facility came into compliance with that requirement a few months later, see Letter from J. Crepps to L. Cayce, Clerk of Court in Abbott (CA5, Jan. 3, 2014), so its precompliance capacity is irrelevant here.

Petitioner Whole Woman's Health performed over 14,000 abortions over 10 years in McAllen. App. 128. Petitioner Nova Health Systems performed over 17,000 abortions over 10 years in El Paso. Id., at 129. (And as I explain at n. 33, infra, either Nova Health Systems or another abortion provider will be open in the El Paso area however this case is decided.)

This conclusion is consistent with public health statistics offered by petitioners. These statistics suggest that ASCs have a much higher capacity than other abortion facilities. In 2012, there were 14,361 abortions performed by six surgical centers, meaning there were 2,394 abortions per center. See Brief for Petitioners 23; App. 236. In 2012, there were approximately 35 other abortion clinics operating in Texas, see id., at 228 (41 total clinics as of Nov. 1, 2012), which performed 53,937 abortions, id., at 236 (68,298 total minus 14,361 performed in surgical centers). On average, those other clinics each performed 53,937 ÷ 35=1,541 abortions per year. So surgical centers in 2012 performed 55% more abortions per facility (2,394 abortions) than the average (1,541) for other clinics.

The Court also gives weight to supposed reductions in "individualized attention, serious conversation, and emotional support" in its undue-burden analysis. Ante, at 2318. But those "facts" are not in the record, so I have no way of addressing them.

See n. 11, supra .

The District Court in Casey found that 42% of Pennsylvania women "must travel for at least one hour, and sometimes longer than three hours, to obtain an abortion from the nearest provider." 744 F.Supp. 1323, 1352 (E.D.Pa.1990), aff'd in part, rev'd in part, 947 F.2d 682 (C.A.3 1991), aff'd in part, rev'd in part, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In that case, this Court recognized that the challenged 24-hour waiting period would require some women to make that trip twice, and yet upheld the law regardless. See id., at 886-887, 112 S.Ct. 2791.

Petitioners' expert testified that 82.5% of Texas women of reproductive age live within 150 miles of a Texas surgical center that provides abortions. See App. 242 (930,000 women living more than 150 miles away), 244 (5,326,162 women total). The State's expert further testified, without contradiction, that an additional 6.2% live within 150 miles of the McAllen facility, and another 3.3% within 150 miles of an El Paso-area facility. Id., at 921-922, 112 S.Ct. 2791. (If the Court did not award statewide relief, I assume it would instead either conclude that the availability of abortion on the New Mexico side of the El Paso metropolitan area satisfies the Constitution, or it would award as-applied relief allowing petitioner Nova Health Systems to remain open in El Paso. Either way, the 3.3% figure would remain the same, because Nova's clinic and the New Mexico facility are so close to each other. See id., at 913, 916, 921, 112 S.Ct. 2791 (only six women of reproductive age live within 150 miles of Nova's clinic but not New Mexico clinic).) Together, these percentages add up to 92.0% of Texas women of reproductive age.
Separately, the State's expert also testified that 2.9% of women of reproductive age lived more than 150 miles from an abortion clinic before H.B. 2 took effect. Id., at 916, 112 S.Ct. 2791.
So, at most, H.B. 2 affects no more than (100% − 2.9%) − 92.0%=5.1% of women of reproductive age. Also recall that many rural clinic closures appear to have been caused by other developments-indeed, petitioners seemed to believe that themselves-and have certainly not been shown to be caused by the provisions challenged here. See supra, at 2345, and n. 18. So the true impact is almost certainly smaller than 5.1%.

The severability provision states:
"(a) If some or all of the provisions of this Act are ever temporarily or permanently restrained or enjoined by judicial order, all other provisions of Texas law regulating or restricting abortion shall be enforced as though the restrained or enjoined provisions had not been adopted; provided, however, that whenever the temporary or permanent restraining order or injunction is stayed or dissolved, or otherwise ceases to have effect, the provisions shall have full force and effect.
"(b) Mindful of Leavitt v. Jane L., 518 U.S. 137 [116 S.Ct. 2068, 135 L.Ed.2d 443] (1996), in which in the context of determining the severability of a state statute regulating abortion the United States Supreme Court held that an explicit statement of legislative intent is controlling, it is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act, are severable from each other. If any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act to impose an undue burden in a large or substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining provisions and shall remain in force, and shall be treated as if the legislature had enacted a statute limited to the persons, group of persons, or circumstances for which the statute's application does not present an undue burden. The legislature further declares that it would have passed this Act, and each provision, section, subsection, sentence, clause, phrase, or word, and all constitutional applications of this Act, irrespective of the fact that any provision, section, subsection, sentence, clause, phrase, or word, or applications of this Act, were to be declared unconstitutional or to represent an undue burden.
"(c) [omitted-applies to late-term abortion ban only]
"(d) If any provision of this Act is found by any court to be unconstitutionally vague, then the applications of that provision that do not present constitutional vagueness problems shall be severed and remain in force." H.B. 2, § 10, App. to Pet. for Cert. 199a-201a.